Approved: _____
Michael K. Krouse / Michael D. Lockard
Assistant United States Attorneys

Before:  THE HONORABLE ROBERT W. LEHRBURGER
         United State Magistrate Judge
         Southern District of New York

**19 MAG 11092**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :    **SEALED COMPLAINT**

              - v. -                :   Violations of
                                        50 U.S.C. § 4819,
                                        15 C.F.R. § 736.2
VITALI NILOV,                       :
    a/k/a "Vitaly Nilov,"                COUNTY OF OFFENSE:
                                    :    NEW YORK
              Defendant.
                                    :
- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK   )
                    ) ss.
COUNTY OF NEW YORK  )

SPECIAL AGENT CHRISTOPHER O'NEILL, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Commerce (the "Commerce Department"), Office of Export Enforcement ("OEE"), and charges as follows:

**COUNT ONE**
(Conspiracy to Unlawfully Export Rifle-Making Equipment)

1. In or about 2019, VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, and others known and unknown, willfully, intentionally, and knowingly combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the Export Control Reform Act.

2. It was a part and an object of the conspiracy that VILTALY NILOV, a/k/a "Vitali Nilov," the defendant, and others known and unknown, would and did agree to export and to cause to be exported from the United States items controlled under Subchapter I of the Export Control Reform Act, to wit,

tools for gun rifling machines, to the Russian Federation, without having first obtained a license for such export from the U.S. Department of Commerce, in violation of Title 50, United States Code, Section 4819(a)(2)(A), (B), (C), (D), (E), (F), and (G), and Title 15, Code of Federal Regulations, Section 736.2(b)(1).

(Title 50, United States Code, Section 4819(a)(1), 4819(a)(2)(A), (B), (C), (D), (E), (F), & (G), and 4819(b), and 15 C.F.R. § 736.2(b)(1).)

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

3. I am a Special Agent with the OEE. In the course of my duties with the OEE, I received training in, and participated in, investigations of, among other things, violations of the U.S. export laws.

4. I have been personally involved in the investigation of this matter. This affidavit is based upon my own knowledge, my conversations with others, including other law enforcement agents, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Background on the Export Control Reform Act

5. The Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4801 et seq., provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport, an in-country transfer of items, and specific activities of United States persons, wherever located, be controlled . . . ." 50 U.S.C. § 4811(2). To that end, the ECRA grants the President the authority "(1) to control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. Id. § 4812(b). The ECRA further grants the

2

Secretary of Commerce the authority to establish the applicable regulatory framework.

6. Pursuant to that authority, the DOC reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

7. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at Title 15, Code of Federal Regulations, Part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export-control requirements depending on destination, end use, and end user.

8. ECCN 2B018 establishes export controls for reasons of national security, missile technology, regional stability, anti-terrorism, and United Nations Security Council arms embargoes. Pursuant to ECCN 2B018(e) and (f), "[g]un barrel rifling and broaching machines, and tools therefor" and "[g]un barrel rifling machines" are subject to export controls. The export of these items to the Russian Federation, among other countries, requires an export license from the Commerce Department.

9. Pursuant to Title 15, Code of Federal Regulations, Section 736.2(b)(1), a person "may not, without a license or License Exception, export any item subject to the EAR to another country or reexport any item of U.S.-origin if each of the following is true: (i) The item is controlled for a reason indicated in the applicable Export Control Classification Number (ECCN), and (ii) Export to the country of destination requires a license for the control reason as indicated on the Country Chart at part 738 of the EAR."

10. Pursuant to Title 50, United States Code, Section 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter." Pursuant to

Section 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a)" is guilty of a crime.

### The Conspiracy to Export Gun Rifling Tools to Russia

11. Since in or about April 2019, I and other law enforcement agents have been involved in an investigation into efforts to export and cause the export of controlled items from the United States to Russia. Based on my review of emails obtained pursuant to judicially authorized search warrants and financial records obtained from banks, interviews with witnesses, and conversations with other law enforcement agents and officers, I have learned, among other things, the following:

a. Beginning in late October 2018, a co-conspirator not named as a defendant herein ("CC-1") began communicating from the Russian Federation by email with a Connecticut-based manufacturer and seller of deep hole gun drilling tools, fixtures, and accessories ("Company-1"). CC-1 sought to obtain approximately $22,000-worth of rifling buttons, gun drills, reamers, and pull bores for approximately 28 types and calibers of firearms.

b. Rifling buttons are tools for forming the rifling grooves and resizing the bore in gun barrels. The Commerce Department has determined that the rifling buttons that CC-1 requested are export-controlled under ECCN 2B018.

c. On or about October 25, 2018, CC-1 sent an email to a representative of Company-1 asking for a sales order and bank wire information for the sale of rifling buttons, gun drills, reamers, and pull bores for approximately 28 types and calibers of firearms. CC-1 provided the following shipping information: "Vitaly Nilov c/o totalrace" at a residential address in Chappaqua, New York, and also provided a U.S. telephone number with an area code covering New York City.

d. The Company-1 representative and CC-1 exchanged several emails about the details of CC-1's proposed order. During that exchange, on October 31, 2018, the Company-1 representative stated, "I wouldn't think you need all these calibers at once, is that true you will be running these all together?" CC-1 replied, "[Y]eah need all of this, and planing to order more." CC-1 also asked for a dealer-pricing discount on the order. After the Company-1 representative advised that a

4

discount would be available only if the order included more components for each caliber, CC-1 responded, on November 6, 2018, "[O]k to get discount please multiply all Qty in the sales order . . . by Two."

e. By early 2019, the sales order was finalized, and Company-1 provided CC-1 with a final pro forma invoice by email on April 3, 2019. On April 8, 2019, CC-1 responded that he had sent the money to Company-1 for the purchase order.

f. Approximately $22,529.22 was transferred from a bank account located in the Russian Federation to Company-1's bank located in the United States between on or about April 3 and 9, 2019.

g. On April 8, 2019, the Company-1 representative sent CC-1 an email stating, in part, "The bank is very reluctant to transfer these funds, they are requesting why this money came from the Russian Federation. Are these tools being shipped out of the USA?" CC-1 responded later that day that "customer paid directly probably they prefer to do it this way, it[']s international company[.] [I]t[']s for new york branch[.]"

h. Another Company-1 representative emailed CC-1 that same day, requesting additional information and clarification about the ultimate purchase of the gun-making tools: "What's the name of the Company in Russia who is ordering for a New York branch, and what's the name and address of the New York Company?" CC-1 responded, in part, "Shipping address in New[]York i gave you before, please check the invoice." The Company-1 representative responded that the address CC-1 had provided was a residential address, not a commercial one. The representative further stated, "The end user is important to us. This is a very large order, the money did not come from where we expected, and our bank is holding the money until we give them these answers."

i. In an email dated April 9, 2019, CC-1 avoided answering Company-1's questions, stating, in part, "Is that important? . . . Can we make things more simple? Like i pay and you ship parts, as usual." The Company-1 representative responded, "It is important because we have to make sure we comply with export laws." CC-1 then asked if there were export restrictions for the tools, and Company-1 advised that it needed to know where the tools would be shipped.

5

j. CC-1 first advised that he preferred to cancel the order. Then, on April 12, 2019, CC-1 sent an email representing that the customer was a company located in Bulgaria and that "[t]hey are ready to place similar orders every month." The website CC-1 provided indicated that the purported Bulgarian end user was a company that operated a plant for manufacturing precision tools for metal-cutting and tool systems for CNC machines (i.e., computer-automated machinery). The website did not indicate that the end user was a gun manufacturer.

k. Company-1 advised CC-1 that it could proceed with a smaller portion of CC-1's original order, totaling $4,824.90.

l. On or about April 30, 2019, CC-1 sent an email to VITALI NILOV, a/k/a "Vitaly Nilov," the defendant,[1] stating, in Russian, "I need to pay 5k to the American company from America for the cargo to you[.] [C]an one send money to you on the card and you'll pay?"[2]

m. On or about May 3, 2019, CC-1 sent NILOV an email CC-1 had received from a company located in Russia that contained a record of payment to "Hometrade Inc." in the amount of $4,924.90, with the payment details described as "for auto parts."

n. On or about May 8, 2019, NILOV caused a credit card payment of approximately $4,824.90 to be made to Company-1 from a credit card account in the name of "Hometrade Inc. Vitali Nilov" and with a billing address of NILOV's residence.

o. On or about May 31, 2019, Company-1 emailed CC-1 an Order Acknowledgement and an "Export Compliance Acknowledgement" form. The Order Acknowledgement included the ECCN for the components in the order that contained rifling buttons, and included a warning that the items were controlled by the U.S. government and "authorized for export only to the country of ultimate destination for use by the ultimate

---

[1] The email account is registered in the name "vitali nilov," and was later used by VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, to email an electronic copy of his New York State driver's license.

[2] All translations in this Complaint are preliminary drafts and subject to revision.

6

consignee or end user(s) herein identified." The customer identified in the Order Acknowledgement was NILOV, and the shipping address was identified as an address in Chappaqua, New York. In addition, the Export Compliance Acknowledgement form represented that the purchaser was aware, among other things, that the order contained items that were export-controlled for reasons of national security, regional stability, anti-terrorism, and United Nations controls; and that the purchaser accepted responsibility for applying for and gaining an approved Commerce Department Export License prior to shipment. In the cover email, a Company-1 representative advised, "Please fill in and sign the export acknowledgement and provide a copy of your passport or driver's license so I can make this part of the file."

p. On or about June 1, 2019, CC-1 emailed the Order Acknowledgement and Export Compliance Acknowledgement to NILOV.

q. On or about June 1, 2019, NILOV sent an email to Company-1 with the subject line, "PAPER WORK. THANKS." Attached to the email was a copy of the Export Compliance Acknowledgement, identifying "Vitali Nilov" as the representative or purchasing agent for Hometrade Inc., located at the address in Chappaqua, New York. The email also included an image of NILOV's New York State driver license. The signatures on the Export Compliance Acknowledgement and NILOV's driver's license are consistent.

r. NILOV and CC-1 then made arrangements for NILOV to pick up the order from Company-1. On August 5, 2019, NILOV arrived at Company-1's office to collect the order of rifling buttons. Law enforcement agents observed NILOV take packages from Company-1 and return to his residence.

s. Later on August 5, 2019, CC-1 emailed Company-1 asking to proceed with the remainder of his April 3, 2019 order.

t. On or about August 5, 2019, NILOV sent CC-1 an email with the subject line, "restrictions," and attaching the Order Acknowledgment. CC-1 replied, "its just that you can't take it to iran or north korea." NILOV responded, "ok," and CC-1 then followed up with: "but it's better to play safe when taking it out of america, what if they ask something." NILOV then replied: "First the idea is to find out if it can be sent

7

at all. We've waited for it so long. The order [sic] You didn't even mention this."

u. On or about August 7, 2019, NILOV emailed a representative of a freight forwarder located in Brooklyn, New York (the "Freight Forwarder"), attaching a copy of Order Acknowledgement and stating, "ask the shipper to look at it[.] there are restrictions for iran and north korea[.] we need to do some paperwork to send it[.] it's sitting in my garage[.]" The freight forwarder representative replied, "I don't see restrictions for russia and they don't have a distributor there. call them and find out, I don't see anything wrong." Three minutes later, NILOV replied: "Ok[.] Let's send it then." NILOV did not contact Company-1.

v. On or about August 8, 2019, NILOV reviewed Company-1's website, including a page about rifling buttons products. NILOV also conducted internet searches including the part number for the rifling buttons, searches related to rifling buttons and tools, and searches relating to export restrictions for rifling buttons. Nilov also visited a website administered by the Department of Commerce's International Trade Administration that contains informational videos and other resources about export controls and license requirements.

12. On August 14, 2019, law enforcement agents observed VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, at the location of the Freight Forwarder. Agents observed NILOV opening the rear hatch of his car and appeared to deliver boxes to an unidentified individual.

13. On August 17, 2019, the Freight Forwarder made a delivery of cargo to Lufthansa Cargo at John F. Kennedy International Airport. I and another law enforcement agent asked a supervisor at Lufthansa Cargo for paperwork relating to cargo the Freight Forwarder had delivered that day. Lufthansa Cargo provided the requested paperwork and identified nine total boxes. The documentation relating to the nine boxes identified the Freight Forwarder as the "U.S. Principal Party in Interest," meaning the person or legal entity in the United States that receives the primary benefit from the export transaction. The documentation identified a German company as the Ultimate Consignee, meaning the principal party in interest located abroad who receives the exported or reexported items (and not a forwarding agent or other intermediary). The documentation identified the contents of the nine boxes as "Auto Parts."

14. I and another law enforcement agent conducted a border inspection pursuant to Title 15, Code of Federal Regulations, Section 758.7, and found that one of the nine boxes contained two smaller boxes each labelled with Company-1's name. Inside the two smaller boxes were rifling buttons, reamers, and drill accessories corresponding to CC-1's purchase order from Company-1.

15. On August 20, 2019, law enforcement agents conducted a voluntary interview of VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, at his residence. I have spoken with the agents who participated in that interview and have reviewed a report of the interview. NILOV advised the interviewing agents, in substance and in part, that (a) NILOV buys and ships items from the United States to customers in Russia; (b) NILOV uses the Freight Forwarder to ship packages to Russia; (c) the items are typically air shipped to Germany and driven across the Russian border; (d) when NILOV picked up the order from Company-1 (see supra, ¶ 12(r)), he was told that he could not ship the rifling-buttons order to certain countries and was given the address for a website with information about export restrictions; (e) NILOV attempted to find the rifling buttons on the website but could not, and afterwards both CC-1 and a representative of the Freight Forwarder told him that the order could be shipped to Russia; (f) NILOV understood that he probably was not supposed to ship the rifling-buttons order; and (g) NILOV understood that the order he shipped to CC-1 in Russia contained tools used for rifles and that CC-1 probably was not the ultimate customer for the order.

16. I have consulted Commerce Department records regarding applications for export licenses, and there is no record of VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, TotalRace, Hometrade, CC-1, or the Freight Forwarder applying for a license to export controlled commodities.

WHEREFORE, the deponent prays that VITALI NILOV, a/k/a "Vitaly Nilov," the defendant, be arrested and imprisoned, or bailed, as the case may be.

*Christopher M. O'Neill*
CHRISTOPHER O'NEILL
U.S. Department of Commerce
Office of Export Enforcement

Sworn to before me this
25th day of November 2019

HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK